IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM WARREN WIELAND,                    Case No. 3:10-cv-00059-MA

           Petitioner,              OPINION AND ORDER

   v.

S. FRANK THOMPSON,

        Respondent.

TONIA L. MORO
Assistant Federal Public Defender
15 Newtown Street
Medford, OR 97501

    Attorney for Petitioner

JOHN KROGER
Attorney General
ANDREW HALLMAN
Assistant Attorney General
Department of Justice
1162 Court Street
Salem, OR 97301-4096

    Attorneys for Respondents

MARSH, Judge

    Petitioner William Warren Wieland, an inmate at the Snake

River Correctional Institution, brings this habeas corpus

proceeding pursuant to 28 U.S.C. § 2254.  Petitioner contends that the evidence presented at his trial was constitutionally insufficient for a rational jury to find him guilty of aggravated murder under the standard set forth in Jackson v. Virginia, 443 U.S. 307, 309 (1979).  For the reasons set forth below, the petition is denied.

## PROCEDURAL BACKGROUND

On March 4, 1993, petitioner was indicted on one count of Aggravated Murder in the 1986 death of his mother-in-law, Katherine Kimbrel.  Kimbrel's stabbing death occurred shortly after a series of fires of petitioner's property.  The state's theory of the case was that Kimbrel suspected petitioner set the fires and that petitioner killed Kimbrel to conceal his identity as the arsonist. In May of 1995, following a three-week jury trial, petitioner was convicted and sentenced to life imprisonment without the possibility of parole for 30 years.

Petitioner directly appealed his conviction, alleging that the trial court erred in admitting evidence of fires occurring in 1991 on petitioner's property in Duvall, Washington, that the evidence was insufficient to support his conviction, and that the trial court denied his right to a speedy trial.  Resp. Ex. 110.  The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review.  Resp. Exs. 113, 114.

2 - OPINION AND ORDER

Petitioner filed a state post-conviction relief (PCR) proceeding, alleging 202 grounds of inadequate assistance of trial counsel and four grounds of inadequate assistance of appellate counsel. (Resp. Ex. 115.) The PCR court denied relief on all grounds. (Resp. Ex. 218.) The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. (Resp. Exs. 222, 223.)

## DISCUSSION

In the instant proceeding, petitioner alleges 209 grounds for relief in his amended petition. In his briefing to this court, petitioner affirmatively limits his argument to Ground 2, contending only that his conviction violates the Due Process Clause because there was insufficient evidence to convict him. Brief in Support (#35) p. 1. Respondent moves to deny relief on the grounds that petitioner has failed to meet his burden on Ground 1 and Grounds 3 to 209, and that relief on such grounds must be denied. Respondent also contends relief on petitioner's sole remaining ground – Ground 2 – must be denied because it is procedurally defaulted, or alternatively, because the state court's rejection of Ground 2 is entitled to deference. Respondent is correct.

## I. Unargued Claims

For habeas relief under § 2254(d), petitioner has the burden of showing that the state court's adjudication of his claims was contrary to or an unreasonable application of established Supreme

3 – OPINION AND ORDER

Court precedent.  See Silva v. Woodford, 279 F.3d 825, 835 (9th Cir.), cert. denied, 537 U.S. 942 (2002)(petitioner bears burden of proving his claims).  Petitioner has failed to meet his burden of proof on Ground 1 and Grounds 3 to 209 because he does not address them in his supporting memoranda.  Id.  Nevertheless, the court has examined petitioner's unargued claims and has determined that they do not entitle him to relief.  Accordingly, habeas relief is denied on petitioner's claims in Ground 1, as well as Grounds 3 through 209, which are not advanced in his memoranda.

## II.  **Procedural Default**

On direct appeal, petitioner argued that there was insufficient evidence to support his conviction and that the trial court erred in denying his motion for acquittal.  In doing so, petitioner cited state law *only.*  Respondent argues that petitioner has failed to fairly present this claim because he did not cite to *Jackson*, or any federal cases or constitutional provisions when making this argument.  Respondent contends that by arguing that the circumstantial evidence was insufficient to support his conviction and relying exclusively on state law, petitioner limited his appeal to state law, and thus failed to fairly present his federal claim.

Petitioner concedes that he referenced only Oregon law when arguing his claim on direct appeal, but nonetheless asserts that citation to federal authority is unnecessary because the Oregon and federal standards are identical.  Petitioner argues that because

the standards are identical, his reliance on upon state law also "fairly presented" his federal constitutional claim. Petitioner submits that because the Oregon state courts necessarily resolved his insufficiency of the evidence claim under the identical standard, his federal claim is sufficiently exhausted.

The parties agree that the Oregon state and federal constitutional standards for sufficiency of the evidence are identical. Jackson, 443 U.S. at 324; State v. Harris, 288 Or. 703, 807-08, 609 P.2d 798 (1980)(quoting Jackson standard); State v. Anderson, 131 Or. App. 8, 10, 883 P.2d 910 (1994)(same).

The Supreme Court has left open the question whether a claim can be properly exhausted when it is unclear from the petition whether the petitioner is relying on a state or federal standard, and the state and federal standard are the same. Duncan v. Henry, 513 U.S. 364, 365-66 (1994)(due process claim not exhausted because state and federal inquiries were somewhat similar and not identical); accord Baldwin v. Reese, 541 U.S. 27, 34 (2004) (declining to decide whether ineffective assistance of counsel claim was exhausted where state and federal standards identical because the issue was raised for the first time in briefing to the Supreme Court).

The Ninth Circuit has recognized that an ineffective assistance of counsel claim was exhausted because the Washington state courts analyzed both state and federal ineffective assistance

claims under the identical Strickland standard.   Sanders v. Ryder,
342 F.3d 991, 999-1000 (9th Cir. 2003), cert. denied, 541 U.S. 956
(2004); but see Peterson v. Lampert, 319 F.3d 1153, 1159-61 (9th
Cir. 2003)(en banc) (concluding that *mere similarity* between state
and federal standards is not enough for exhaustion purposes);
Fields v. Waddington, 401 F.3d 1018, 1021 (9th Cir.), cert. denied,
546 U.S. 1037 (2005)(because state and federal standards were not
identical, federal due process claim was not exhausted).

     Sanders is distinguishable from this case because there the
Ninth Circuit found it significant that Sanders was proceeding *pro
se* and that Sanders had cited federal authority in his reply brief.
Id. at 999.   The Ninth Circuit has yet to extend Sanders to
instances, such as this case, where the petitioner was represented
by counsel and relied solely on state law.   Thus, Sanders is not
dispositive.

     In a similar situation, the Second Circuit determined that
where the federal and state inquiries are the same, a petitioner
has fairly presented his federal constitutional claim for
exhaustion purposes, even if it was presented to the state courts
as a state claim only.   Jackson v. Edwards, 404 F.3d 612, 620-21
(2d Cir. 2005).   In Jackson, the Second Circuit concluded that
because the petitioner "necessarily raised the entirety of his
federal claim" when he raised his state due process claim in his
appellate briefing.   Id. at 621.   Thus, the Jackson court concluded

that because the state claim and federal claim were "virtually identical," the state appellate courts necessarily had an opportunity to pass on and correct alleged violations of his federal due process rights, and his federal claim was exhausted. Id.

The district courts within the Ninth Circuit have reached different outcomes when addressing this precise issue. Compare Shepperd v. Wasden, 2010 WL 672757, *4-5 (D. Idaho Feb. 20, 2010)(finding Idaho jury instruction standard "essentially the same" as federal standard, thus federal claim exhausted), Williams v. Hall, 2009 WL 1422744, *5 (D. Or. May 20, 2009)(extending Sanders to find insufficiency of evidence claim exhausted where Oregon and federal standard identical), and Lowe v. Schomig, 2007 WL 773881, *3 (D. Nev. Mar. 9, 2007)(extending Sanders to find insufficiency of evidence claim exhausted where Nevada and federal standard identical), with Lacy v. Belleque, 2010 WL 3866719, *3 (D. Or. Sept. 21, 2010), aff'd 441 Fed. Appx. 472 (9th Cir. 2011)(declining to extend Sanders, finding sufficiency of evidence claim not exhausted, but nevertheless examining the merits of the claim).

I am not persuaded by respondent's argument that on direct appeal, petitioner was simply arguing the finer points of circumstantial versus direct evidence under Oregon law. A review of petitioner's briefing reveals that he argued that the

circumstantial evidence presented at trial was insufficient to support his conviction. And on that point, the Oregon courts necessarily examined the evidence and applied the identical Jackson standard to uphold his conviction.

Because, as a practical matter, petitioner has provided the state courts with a fair opportunity to examine the issue of whether sufficient evidence existed to convict petitioner, and the state court applied the identical Jackson standard when doing so, I find petitioner has sufficiently exhausted Ground 2. Shepperd, 2010 WL 672757 at *5. Furthermore, because neither the Supreme Court nor the Ninth Circuit have yet determined that presentation of a state constitutional claim fairly presents a federal constitutional claim where the standards are identical, and the law is continuing to evolve, I will consider the merits of petitioner's sufficiency of the evidence claim contained in Ground 2.[1] Williams, 2009 WL 1422744 at *5.

## III. **Merits — Ground 2**

Petitioner alleges that the trial court erred in not granting his motion for judgment of acquittal. In his supporting memoranda,

---

[1]I also reject respondent's argument that petitioner's claim is partially procedurally defaulted because petitioner did not move in the trial court for a judgment of acquittal on the lesser included offense of murder. Petitioner argued to the trial court, and again on direct appeal, that there was insufficient evidence to conclude that he caused the death of victim. Tr. 1793, 1794; Resp. Ex. 110, p. 15; Resp. Ex. 112, p. 1.

petitioner essentially argues that the evidence presented at trial was constitutionally insufficient to support his conviction on every element of aggravated murder. Therefore, I have reviewed the evidence in great detail. When assessing the sufficiency of the evidence to support a conviction, I must view the evidence in the light most favorable to the prosecution. Jackson, 443 U.S. at 319; Boyer v. Belleque, 659 F.3d 957, 960 (9th Cir. 2011), cert. denied, 132 S. Ct. 2723 (2012). Where there are conflicting inferences in the record, I must presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

**A.   Evidence Presented at Trial**

**1.   History and purchase of the Monroe farm**

Petitioner married Cindy Wieland in 1972, and they have two children, Jody and Joshua, born in 1974 and 1979 respectively. Petitioner worked as a journeyman electrician for five years, then worked in the construction industry building approximately 40 homes in Anacortes, Washington. Petitioner testified that he became bored, and wanted to get out of construction and move to the country. In September of 1983, the Wielands purchased a 15.09-acre farm adjacent to Highway 99W in Monroe, Oregon. Tr. 2153. At that time, the farm consisted of grazing acreage, a yellow house, a mother-in-law cottage, an old barn, a four-stall machine shed, and various out buildings, most of which were run-down and in need of

repairs.  Tr. 135, 140, 2146.   Petitioner testified that the family planned to live in the yellow house while he constructed Cindy's "dream house."  Tr. 2148.

Petitioner testified that sometime after purchasing the Monroe farm, he intended to operate a small "jug" dairy, but later decided to operate a dairy farm with 100 cattle.  Tr. 2148.  The family did not immediately move onto the Monroe farm.  Instead, petitioner rented the yellow house to Howard Nash, who acted as caretaker of the farm.  Nash had agreed to do some work on the farm in exchange for a reduction in his rent.  Tr. 2153.

**2.   1984 barn fire**

In June of 1984, petitioner made a two-week visit to the Monroe farm in order to check on the property and make improvements.  Tr. 145.  During petitioner's visit, on June 21, 1984, at 3:18 a.m., Howard Nash testified that he was awakened by a neighbor knocking on the door, yelling that the barn was on fire.  Tr. 548.  The Monroe Fire Department quickly arrived.  Tr. 468-69, 549.  Doug Albin, the Monroe Fire Chief, testified that when he arrived at the scene, the barn was engulfed in flames and had burned to the ground.  Tr. 470.  Albin investigated and determined the fire was caused by an electrical impulse box, or fencer, that was mounted on the inside wall of the barn.  Tr. 473.  Albin believed some arcing between the fencer and the ground wire ignited

some hay or dried grass inside the barn.  Tr. 521.  Petitioner had replaced the fencer in May of 1984.

Nash testified that a night or two before the barn caught fire, petitioner mysteriously informed him that if the barn burned down, he would find $600 in the house.  Tr. 547.  Nash testified that he informed petitioner that he would not go to jail for anybody.  Tr. 548.  Nash testified that when he and petitioner were cleaning up the barn after the fire, he jokingly asked petitioner for his $600, and that petitioner responded only by saying that Nash did not burn the barn.  Tr. 551.  Nash further testified that petitioner did not express any regret that the barn had burned. Tr. 551.  Howard Nash's cousin, Timothy Nash, testified that soon after the barn fire, he was on the farm and that petitioner told him the house would be next.  Tr. 563.

State Farm Insurance paid the Wielands $25,000 on the claim. Tr. 144, 147, 821.  Cindy testified that petitioner seemed excited that the barn burned down in 1984, and that petitioner invested the insurance proceeds into other buildings for the dairy operation, including a big blue barn, a milking parlor, and holding pen.  Tr. 145, 147-48, 2165.  Petitioner's friend Mark Marzolf testified that after the barn fire, petitioner said collecting insurance was an easy way to make money.  Tr. 588.

////

////

11 - OPINION AND ORDER

### 3.    The dairy operation

Petitioner moved to the farm in the fall of 1984 and began operating the dairy with 23 cows.    Cindy, Jody, and Joshua moved to the Monroe farm in late December of 1984.  Tr. 2162.  By June of 1986, petitioner had 97 cows, and was milking them two times per day, 4 a.m. and 4 p.m.  Tr. 2168.  Petitioner described that on a typical day, he would rise around 3:20 to 3:30 am, have a cigarette (petitioner smoked one and a half packs per day) and a glass of malted milk, then go to the barn to complete his milking chores. Tr. 2204.  Petitioner handled the milking alone, until May of 1986, when he hired Tim Poublan to assist him.  Tr. 2172.  Poublan described that on a typical shift, he would arrive between 3:30 and 4 a.m., sanitize the lines, gather the cows, and milk them 12 at a time.  Tr. 1834-35.  Poublan testified that he usually completed his shift and left the farm before 8 a.m.  Tr. 1835.

### 4.    Kimbrel's house

After Kimbrel was widowed, petitioner suggested that Kimbrel move to the Monroe farm from Anacortes, Washington, to be with the her daughter and grandchildren.  Tr. 159.  Petitioner offered to build Kimbrel a house if she would live on the farm.  Tr. 2179.  In February of 1985, petitioner tore down the existing mother-in-law cottage and built a new home for Kimbrel.  Kimbrel moved in when new house was completed in June of 1985.  Tr. 159, 2179-80.  In the spring of 1986, the Wielands discussed replacing the yellow house

with a new home, and moving the yellow house off of the property.
Tr. 165, 2184.

### 5.    Monday June 9, 1986 attic fire

About 6:00 a.m. on Monday morning June 9, 1986, there was fire
in the attic of the yellow house.  Passersby, Gordon Loeschen,
Kenneth Beelart, and Michael Gibson were each driving on Highway
99W when they saw smoke pouring out of the roof.  Gibson stated
that when he arrived, he noticed a hole in the roof with flames
venting through.  Tr. 881.  Loeschen testified that when he saw the
smoke, he turned into the driveway and began honking his horn to
wake the occupants of the house.  Tr. 567-68.

Cindy recalled the event similarly.  Cindy described that she
was awakened by a car honking and someone banging on her window.
Tr. 167.  Once Loeschen told her the roof was on fire, Cindy
immediately went to get the children, whose bedrooms were upstairs.
Tr. 168.  Petitioner was not in the house, but was out in the barn
milking the cows.  Tr. 167.  Cindy recalled that Kimbrel called
911, and the fire department came a few minutes later.

Beelart testified that he happened to be driving a water truck
that day.  Tr. 575.  Beelart recalled that while Loeschen went to
the house, he backed the truck up to the house and began unreeling
hoses and getting the pump motor started on the water truck.  Tr.
576.  Gibson described that he and Beelart got onto the roof and
used the water from the pump truck to douse the flames.  Gibson

stated that while he and Beelart were on the roof, he saw petitioner in the milking parlor watching them put out the fire. Tr. 882.   Beelart and Loeschen recalled that after the fire department arrived, petitioner came over toward the house from the barn and told Beelart to stop making noise, and that Beelart was scaring his cows.   Tr. 570, 579-80.   Beelart also noted that petitioner did not express any gratitude or appreciation to him, and did not spend much time with his family. Tr. 581. Cindy also testified that petitioner appeared more concerned about his cows than the fire, and that petitioner did not stay at the house very long after the fire.   Tr. 169.

Monroe Fire Chief Albin investigated the fire and concluded that it was caused by an electrical short in the attic fan.   Tr. 474.  The Wielands received $6,000 in insurance proceeds for damage to the house.   Tr. 172, 821-22.

### 6.   Monday June 16, 1986 drawer fire

Cindy testified that on the following Monday morning, June 16, 1986, she woke up and smelled smoke.   Tr. 172.   Cindy, Jody and Joshua were all inside the house, while petitioner was outside attending to his milking chores.   Tr. 172-73.   Cindy stated that she sent the children over to Kimbrel's house, got petitioner from outside, and she and petitioner searched their home for the source of the smell.  Tr. 173.  When petitioner opened a bathroom drawer, it exploded into flames.  Tr. 174.

Albin testified that petitioner came to his office and asked him to investigate another fire at the house. Tr. 483. Albin did so and concluded the fire appeared to be set by a child. Tr. 176. Albin testified that petitioner wanted him to ask Jody and Joshua about starting the fire, and that petitioner suggested that Jody may have been responsible because she was unhappy in school. Tr. 484, 491.

Cindy testified that she then became frightened because she believed a stranger wanted to burn down the house, and she questioned whether the first fire was accidental. Tr. 175, 178. Because the two previous fires occurred on a Monday morning, Cindy and Kimbrel planned that Kimbrel would sleep on the sofa of the yellow house on Sunday night, in an effort to catch the arsonist. Tr. 180. Cindy testified that she informed petitioner of the plan. Id. Cindy testified that they removed petitioner's matches from counter, installed a smoke detector, and that petitioner locked the back door when he went out do the milking. Tr. 177.

**7.   Sunday June 22, 1986 house fire**

Cindy testified that on the following Sunday morning, June 22, 1986, she awoke to the sound of the smoke detector going off. Tr. 182. Again, Cindy, Jody and Joshua were inside the house, while petitioner was outside attending to his milking chores. Tr. 183-85. Cindy stated that she pushed open her bedroom door, and saw the whole dining room engulfed in flames. Tr. 184. Cindy

testified that there were dozens of boxes stacked in the dining room which contained items which had not been unpacked, and that all of them were burning. Tr. 184. Cindy stated that she thought it was odd that her door was nearly closed because her bedroom door was usually open. In fact, that morning was the only morning Cindy recalled finding her door closed. Tr. 184.

Cindy described that there was smoke everywhere and that the flames were directly under the children's bedrooms. Cindy described the heat as intense, and that the flames were blocking the exits. Tr. 190. Cindy then woke the children and brought them into her room, planning to break a window to get out. Tr. 190. Cindy stated there was thick smoke in her bedroom, and that she felt weak. Cindy had the children get under the covers to protect them from inhaling smoke. Tr. 190. Cindy testified that she attempted to break the window by hitting it with a wooden stool more than a dozen times, but the window would not break. Tr. 191. Cindy described that she and the children were crying and the room was black with smoke. Tr. 191.

Cindy recalled that she next heard the fire whistle and heard a voice outside, and then a man outside broke the window. Cindy described that she lifted Jody and Joshua out the window, and then she tried to dive out the window. Tr. 192-93. Cindy testified that a man and petitioner broke her fall, but she suffered a long, severe cut on her leg and foot from the broken glass. Tr. 193-94.

16 - OPINION AND ORDER

The man who broke the window was Walter Curtis Johnson, who was traveling on Highway 99W with his wife Susan, when they saw the house on fire.  Mr. Johnson testified that he pulled into the driveway and began honking the horn to wake the occupants of the house.  Mr. Johnson parked in front of the new house, and Kimbrel came out and said that her daughter and grandchildren were inside the old house.  Tr. 605.  Johnson recalled that he sent his wife around to the front of the house to wake people while he and Kimbrel tried to open the back door.  Tr. 605.  Johnson testified that Kimbrel tried to open the back door of the house, but it was locked.  Johnson stated that when Kimbrel found the key and opened the back door, flames blocked their entrance.  Tr. 605.

Johnson then ran to the front of the house to find that his wife had attempted to break the bedroom window with a splitting mall she had found in the yard.  Tr. 606.  Mr. Johnson stated that he then broke open the window with the mall, and helped Joshua, Jody, and Cindy out the window.  Tr. 606.

Susan Johnson testified that when Kimbrel came out of her house, she seemed panicked because her daughter and grandchildren were inside the other burning house.  Tr. 618.  Mrs. Johnson testified that at some point, petitioner arrived, and she was told by Kimbrel that he was the father.  Mrs. Johnson described that there was a lack of reaction by petitioner, and that she did not see petitioner hug or console the children or his wife.  Tr. 623,

17 - OPINION AND ORDER

628. Mr. and Mrs. Johnson both testified that petitioner displayed no gratitude or appreciation to them. Tr. 609, 625.

Cindy and the children went to the hospital in an ambulance, while petitioner and Kimbrel finished chores and met them at the hospital later. At some point in his investigation of the fire, Kimbrel told Chief Albin that "This has gone too far, something's going to have to be done." Tr. 676.

The fire department and insurance company investigated and determined that the fire started in the dining room around 6 a.m. Tr. 690, 695. Paul Shiell, the insurance company investigator, testified it was obvious that the fire started on top of the pile of boxes high up, burned quickly, and undoubtedly was deliberately set. Tr. 778, 782, 787-88. State Farm Insurance paid the Wielands $125,000. Tr. 827-28.

**8.   Between the house fire and Kimbrel's death**

After the fire, the family moved into Kimbrel's house. Tr. 198. Several of Kimbrel's friends testified that after the house fire, Kimbrel's demeanor changed. Kimbrel's long-time friend, Julie Raney, testified that Kimbrel informed her that the house fire was more serious because it was set intentionally in an attempt to hurt Cindy and the children, and that the police suspected the arsonist was someone who had been in the house. Tr. 1263-64. Raney stated that she advised Kimbrel to leave, but Kimbrel stated that "Cindy's not going to the leave Bill, and I

won't leave Cindy." Tr. 1263. Raney testified that Kimbrel's tone was flat, and Kimbrel asked for Raney to pray for the safety of Kimbrel's family. Tr. 1264.

Florence Dulin, another friend of Kimbrel's, testified that she received a telephone call from Kimbrel 10 days before Kimbrel's death. Dulin described that in the conversation, Kimbrel used a quiet, distressed voice, and there were long pauses in the conversation, which was quite unusual because Kimbrel was typically loud and had much to say. Tr. 1276. Dulin said that Kimbrel asked Dulin to pray for her, and when Dulin asked whether she could call the sheriff, Kimbrel replied quietly, "no." Tr. 1274.

Donald Farmer, who was the pastor of church where Kimbrel was an active member, testified that Kimbrel was concerned about the fires, that Kimbrel told him that she did not think Jody was responsible, and that Kimbrel told him about planning to catch the person starting the fires. Tr. 1119. Farmer testified that Kimbrel was terrified after the house fire because Cindy and the children could have been killed. Tr. 1116. Farmer said that after the house fire, Kimbrel just "clammed up" which gave Farmer the impression that she knew who was responsible, but could not talk about it. Tr. 1122. Several other members from Kimbrel's church testified that after the house fire, Kimbrel expressed fear for the safety of her family. Tr. 1085, 1090, 1099.

Jeff Starr, who was 14 years old in 1986, testified that after the house fire, he started working on the Wieland farm because Cindy was injured.   Starr testified that he began by sorting salvageable household items from destroyed household items, and once that was completed, petitioner asked him to do other odd jobs around the farm.  Tr. 1658.

Starr stated that when he was working, he saw discussions between petitioner and Kimbrel that were clearly disagreements, and that he got the sense that things were not right between petitioner and Kimbrel.   He described Kimbrel as "tense" around petitioner. Tr. 1634.  Starr also testified that petitioner did not express any regret about the loss of the house.  Tr. 1637.

### 9.   Kimbrel's death July 15, 1986

Cindy testified that on the evening of July 14, 1986, she was in a great deal of pain due to her leg injury and did not fall asleep until 4:30 a.m. on the morning of July 15.  Cindy testified that she woke around 8 a.m., and heard Kimbrel coming to wake her. Cindy testified that she heard petitioner instruct Kimbrel to let her sleep because Cindy had difficulty sleeping the previous night. Tr. 213.   Cindy testified that it sounded like Kimbrel was preparing breakfast for petitioner and Joshua.  Tr. 213.  Jody was out of town visiting a friend.

Cindy testified that she fell back to sleep and next recalls hearing petitioner come into the bedroom between 10:15 and 10:30

a.m. and he asked Cindy how to clean his suede shoes.  Petitioner was scheduled for an 11:30 a.m. hearing with the Board of Equalization in Corvallis concerning the property tax assessments on the farm.  Tr. 841-42.  Cindy testified that she thought that petitioner was leaving a little early, because it only took 30 minutes to get to Corvallis.  Tr. 215.  Cindy recalled that petitioner changed clothes, cleaned his shoes, and left for the hearing.  Tr. 217.  Cindy testified that she inquired where her mother was and that petitioner responded that he saw Kimbrel on the way to the barn to check on the horse.  Tr. 217.  Cindy testified that she heard Joshua in his room watching cartoons.

Cindy testified that she got out of bed around 11:30 a.m., dressed and ate.  Cindy recalled that petitioner returned from the hearing around 12:30 p.m., and noted that she was concerned because she had not yet seen Kimbrel.  Cindy testified that petitioner asked her to wait until he finished a phone call to an acquaintance, and together they would look for Kimbrel.

Cindy recalled finding her mother's purse and noted Kimbrel's car was still at the farm.  Cindy then started calling neighbors to see if they had seen Kimbrel.  Cindy testified that petitioner checked the barn, drove to Kimbrel's friend's house, and a nearby restaurant to check for Kimbrel.  Around 2 p.m., petitioner finally went to the woods to look for Kimbrel.  Cindy testified that she heard petitioner yelling at her to call an ambulance and to call

21 - OPINION AND ORDER

the police.   Tr. 226.   Cindy immediately called 911.   Cindy testified that she asked petitioner if her mother was alive, and petitioner responded that he did not know because he could not go up to her because she looked white and waxy.   Tr. 230.

Emergency personnel arrived and pronounced Kimbrel dead on the scene.  While investigating, the police recovered a fresh cigarette butt by a tree near the body, a folded paper towel, and a pair of cloth gloves.  No other significant evidence was discovered at that time.  Medical evidence placed the time of death between 9 a.m. and 12 p.m.

The police called in specially trained trackers to search the surrounding area.  Three trackers testified that there were no footprints leading into or out of the murder scene, meaning that the murderer must have accessed the woods by the path from the house.  Two trackers testified that they found one fresh boot print near the body that matched a boot print made by petitioner later that day.  Tr. 1328, 1391.  At the time, that evidence was not considered significant because the trackers had been told that petitioner discovered the body.  Tr. 1395-97, 1616.  Only later did the trackers learn that petitioner denied going within 30 feet of Kimbrel's body.

The cigarette butt was determined to be the brand smoked by petitioner.[2]  Tr. 181, 1583.

The investigation into the murder quickly pointed to petitioner as the main suspect.  Tr. 1696-1715.  Petitioner was interviewed, but was not charged at that time.

The jury heard testimony from Diane Van Syoc, who was the clerk for the Board of Equalization, in Corvallis, Oregon.  Tr. 940.  Van Syoc testified that petitioner had a hearing scheduled on July 15, 1986 at 11:30 a.m., and that petitioner arrived sometime between 11 and 11:10 a.m.  Tr. 841, 846.  Van Syoc testified that at the beginning of the hearing, petitioner's demeanor was very calm, but he became agitated and upset when the appraisers indicated that they had been given permission to come onto the property by Kimbrel.  Tr. 844.  Van Syoc recalled that petitioner was angry and left at 11:40 a.m.  Tr. 850-51.

The jury also heard testimony from Charles Nelson, a real estate appraiser, who attended the Board of Equalization hearing. Nelson testified that petitioner was very angry, and that petitioner came out of his chair a couple of times, causing Nelson to fear that petitioner may attack the Board.  Tr. 954.

---

[2]The cigarette butt was misplaced in evidence for a period of time during the lengthy delay between the 1986 murder and 1995 trial.  Ultimately, the cigarette butt was located during the trial.

23 - OPINION AND ORDER

Jeff Starr's father, Wilbur Starr, testified that Jeff worked at the Wieland farm every day after the fire through July 14, 1986. Mr. Starr further testified that he received a phone call from petitioner on the morning of July 15, 1986, and was told that Jeff was not needed at the farm that day. Tr. 2308. Jeff Starr recalled the same. Tr. 1658.

Tim Poublan testified that he worked on July 15, 1986, but finished his milking chores and left the farm by 8 a.m. The trucker who regularly picked up petitioner's milk for shipping every other day between 9 and 10 a.m., was on the farm on July 14 and 16, not on July 15, 1986. Tr. 2304, 2334.

**10. Discovery of the knife**

After Kimbrel's death, Cindy refused to live on the farm and the family returned to Washington. Tr. 247-48, 2255. Ron Spencer purchased the Monroe farm from petitioner in September of 1988. Tr. 255, 1447. Spencer testified that in July of 1989, when he and his son were cutting down a vertical metal pipe in front of the barn, they discovered a large kitchen knife inside the hollow pipe. Tr. 1449-51. Spencer testified that the pipe was open at the top, allowing water to collect inside the pipe. Tr. 1450-51. Spencer contacted the Sheriff's department, and a deputy came to the Monroe farm and retrieved the knife and pipe. Tr. 1455. Spencer stated that when the deputy arrived, he noticed that some baling wire had

been stuffed into the end of the pipe, which had become rusted due to its exposure to the elements.  Tr. 1455.

Several witnesses identified the knife as belonging to Kimbrel, including Cindy and Jody Wieland, and Kimbrel's friend Vivian Clifton.  Tr. 294, 528, 536, 1742,  Ms. Clifton testified that Kimbrel had owned the knife for a very long time, and used it frequently.  Tr. 536.

The knife was tested for fingerprints and other trace evidence, but none were found.  Roy Apter, the medical examiner who performed Kimbrel's autopsy, testified that the fatal stab wound cut the pulmonary artery, causing a massive hemorrage and that Kimbrel died within four or five minutes.  Tr. 1496.  Apter described that there were five other wounds on Kimbrel's body, two more stab wounds on the chest, two to the abdomen, and a defensive cut on her left arm.  Tr. 1470.  Apter also testified that he believed the wounds were caused by a single-edged knife, and that the knife found on the property was consistent with the wounds on Kimbrel's body.  Tr. 1495, 1499, 1543.

**11.  Interlocutory appeal and the 1991 fires**

Prior to trial, the prosecution moved to admit evidence concerning the 1984 barn fire, and fires occurring in September and November of 1991 in Duvall, Washington.  The trial court ruled that evidence concerning the 1984 barn fire was admissible, but evidence concerning the 1991 fires was inadmissible.  The state appealed the

evidentiary ruling on the 1991 fires.  The Oregon Court of Appeals reversed, ruling that evidence of the 1991 fires was relevant and admissible under the "doctrine of chances." State v. Wieland, 131 Or. App. 582, 587, 887 P.2d 368 (1997).  The court concluded that evidence concerning the 1991 fires was relevant and admissible under OEC 401 to establish that the 1986 fires were caused by arson, noting that the more often an unusual event occurs, the less likely that event is accidental.  Id. at 588-89.

Cindy Wieland testified that petitioner began a milking operation in Duvall which was successful initially.  Tr. 257. However, hay and grain prices went up, milk prices went down, and severe flooding affected Duvall in 1990.  Tr. 258.  Cindy testified that the floods nearly wiped out the dairy operation, and that the Wielands did not have flood insurance.  Tr. 259.  Cindy and petitioner lost their vehicles in the flood and petitioner began driving Jody's distinctive Toyota 4x4 pickup.

Cindy testified that in August of 1991, petitioner decided to quit the dairy business, moved onto rental property in Snohomish, and they began selling off petitioner's equipment.  Tr. 263, 266. Cindy stated that they owed about $230,000 at that time. Tr. 267. Cindy also testified that petitioner would drive to the Duvall property in the middle of the night and load up the truck with their belongings, and drive back to Snohomish and unload it the next day.  Tr. 273.

26 – OPINION AND ORDER

On September 16, 1991, there was a fire on the Duvall property. Cindy testified that she learned of the fire from Jody, who called her from school. Tr. 274. When petitioner and Cindy arrived at the farm, they discovered a small house had burned down, as well as the milking parlor. Tr. 276. Cindy testified that after the September 16 fire, she and petitioner removed the last of their belongings from the property, but they kept making insurance payments. Tr. 282.

On November 18, 1991, there was a second fire at the Duvall property. Cindy Wieland testified that she again learned of the fire from Jody, who called her from school. Tr. 284. When Cindy and petitioner arrived at the farm, they discovered that the main house had burned to the ground, leaving only the foundation and chimney. Tr. 285.

Robert McDermott testified that he investigated the September 16 and November 18 fires, and concluded they were intentionally set and that an accelerant had been used in the November 18 fire. Tr. 728, 730, 732, 734. Farmers insurance paid $192,835 on claims resulting from the 1991 fires.

A truck driver identified petitioner's pickup truck near the Duvall property around the time of the September 16 fire. Tr. 902-05. A neighbor observed petitioner and/or his pickup near the Duvall property shortly before the November 18 fire. Tr. 949, 950.

At trial, the court admitted evidence of the 1991 Duvall fires. The trial judge instructed the jury that "you are to consider this evidence only to the extent that it tends to prove that the 1986 fires were not accidental, or for what bearing it may have that the 1986 fires were set by a member of [petitioner's] immediate family. It has no other relevance for any other purpose and you may not consider it as to any of the other issues. I would, also, instruct you that [under] Oregon Law, the statute of limitations on the crime of arson is six years." Tr. 2564.

Cindy testified that she separated from petitioner in August of 1992 because the previous 20 years had been one disaster after another. Cindy Wieland testified that she then contacted the authorities and cooperated with the investigation. Tr. 293.

**12. Motion for judgment of acquittal**

At the close of the state's case, petitioner moved for a judgment of acquittal, contending that the prosecution had presented insufficient evidence to support a conviction for aggravated murder. Tr. 1769. Petitioner argued that to prove aggravated murder, the prosecution needed to show a nexus between the fires and Kimbrel's death, and that the state had failed to link the two. Id.

The prosecution argued that it had presented numerous pieces of evidence from which "a reasonable jury could infer knowledge or belief that [petitioner] was the one [Kimbrel] suspected of setting

the fires, and that ultimately he killed her for that reason." Tr. 1771. The prosecution's lengthy argument included the following: (1) Kimbrel came up with a plan to catch the arsonist, which was shared with petitioner; (2) investigators suspected Jody set the fires, but Kimbrel did not; (3) Kimbrel was aware of petitioner's unemotional responses to the fires; (4) Kimbrel knew that petitioner was always at the barn when the fires occurred; (5) petitioner knew the floorplan of the house; (6) Kimbrel's demeanor changed after the house nearly burned down; (7) Kimbrel stated to her friend that Cindy would not leave petitioner, and Kimbrel would not leave Cindy; (8) the proximity of fires to the murder; (9) no other viable reason that Kimbrel would have been killed.[3]  Tr. 1771-78.

The Trial court denied the motion, ruling that:

there is evidence in the record from which the - the jury could find that [petitioner] killed Katherine Kimbrel.. And I'm, also, satisfied from the record that there is evidence in which the jury could find that [petitioner] set the 1986 house fire.  Tr. 1792.

The trial court ruled that even without regard to the 1991 fires, there was evidence from which the jury could conclude that petitioner set the 1986 fires, and Kimbrel could have learned that he set them.  Tr. 1792-93.

_____

[3]There was testimony that Kimbrel's journal was missing for a period of time after her death.  The journal was discovered at some point during the trial and contained no entries after Kimbrel moved to Oregon.

After presentation of the defense's case, including testimony from petitioner, and closing arguments, the jury deliberated for two days and returned a guilty verdict.

**B.    Legal Standards – Sufficiency of the Evidence**

A federal habeas court may review a claim that the evidence adduced at a state trial was not sufficient to convict a criminal defendant beyond a reasonable doubt.  <u>Jackson</u>, 443 U.S. at 321. Under *Jackson*, the relevant question is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. Additionally, under 28 U.S.C. § 2254(d), habeas relief may not be granted on a claim that was adjudicated on the merits in state court, unless the adjudication resulted in a decision that was contrary to, or was an unreasonable application of clearly established Federal law, or was based on an unreasonable determination of the facts in light of the evidence presented. <u>Boyer</u>, 659 F.3d at 964.

The Supreme Court recently reiterated the doubly-deferential nature of petitioner's claim:

> *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of
> judicial deference. First, on direct appeal, "it is the
> responsibility of the jury–not the court–to decide what
> conclusions should be drawn from evidence admitted at
> trial. A reviewing court may set aside the jury's
> verdict on the ground of insufficient evidence only if no

rational trier of fact could have agreed with the jury."
And second, on habeas review, a "federal court may not
overturn a state court decision rejecting a sufficiency
of the evidence challenge simply because the federal
court disagrees with the state court.  The federal court
instead may do so only if the state court decision was
objectively unreasonable."

Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012)(per curiam)

(quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011)(per curiam)

(internal quotations omitted).  Accord Boyer, 659 F.3d at 694;

Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009); Juan H.

v. Allen, 408 F.3d 1262, 1275 n.13 (9th Cir. 2005), cert. denied,

546 U.S. 1137 (2006).

     Thus, to obtain relief, petitioner must demonstrate: (1) that

based upon the record evidence presented at trial, no rational

trier of fact could have found proof of guilt beyond a reasonable

doubt under *Jackson*; and (2) the state court's rejection of his

claim was an objectively unreasonable application of the *Jackson*

standard.  Briceno, 555 F.3d at 1078.

     In determining the legality of petitioner's conviction, this

court must "review the 'last reasoned state court decision,' which

in this case, was the trial court's denial of [petitioner's] motion

for judgment of acquittal[.]"  Boyer, 659 F.3d at 694 (quoting

Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008)).

     This court looks to Oregon law for the substantive elements of

the offense, "but the minimum amount of evidence that the Due

Process Clause requires to prove the offense is purely a matter of

federal law." <u>Johnson</u>, 132 S. Ct. at 2064; <u>Boyer</u>, 659 F.3d at 965.

The offense of aggravated murder requires proof that the defendant intentionally caused the death of a person, "in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." O.R.S. § 163.095 (defining aggravated murder), O.R.S. § 163.115 (defining murder), O.R.S. § 163.005 (defining homicide). The offense of arson requires proof that the defendant, by starting a fire, intentionally damages any property and "recklessly places another person in danger of physical injury[.]" O.R.S. § 164.325. Thus, in this case, the evidence presented in support of petitioner's aggravated murder conviction is legally sufficient if, when viewed in the light most favorable to the prosecution, it can support a finding that petitioner killed Kimbrel in an effort to conceal his identity as an arsonist. <u>Boyer</u>, 659 F.3d at 966.

**C.    Analysis**

Petitioner's argument before this court is three-fold. First, petitioner contends there was insufficient evidence to find that he committed any act of arson prior to Kimbrel's death on July 15, 1986. Second, petitioner argues that there was insufficient evidence that Kimbrel suspected petitioner of committing arson. And third, petitioner submits there was insufficient evidence that petitioner understood that Kimbrel suspected him of arson, or that he murdered Kimbrel. Petitioner's arguments fail.

32 – OPINION AND ORDER

### 1.    Petitioner committed arson before 1986

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that petitioner committed arson prior to Kimbrel's death.  The evidence established that the 1986 house fire was intentionally set.  The evidence also overwhelmingly established that the house fire placed Cindy, Jody, and Joshua in danger – they narrowly escaped a raging fire.  And, there was circumstantial evidence from which a rational jury could conclude that petitioner set the fire.

Specifically, petitioner had the opportunity to start the fire as he was out in the barn at the time the fire started; petitioner had a motive for setting the fire – petitioner wanted to get rid of the old yellow house and he received approximately $125,000 in insurance proceeds; the fire started on a Sunday morning when petitioner knew of Kimbrel's plan to sleep on the sofa to catch the arsonist Sunday night; the family did not believe that Jody set the fire; petitioner's unemotional reaction to house fire was suspicious; and petitioner expressed no regret over the loss of the house.

Petitioner's theory that a stranger passing by on Highway 99W could have started the fire is improbable.  Petitioner's theory was undercut by Johnson's testimony that the back door was locked and by Cindy's testimony that her bedroom door was closed on the morning of the fire.  Petitioner suggests that a passerby could

have broken the dining room window and reached in to start the
boxes on fire.   However, a reasonable jury could have credited
contrary evidence presented by the prosecution that the window was
either broken by the heat of the fire or by firefighters
extinguishing the blaze.

Based on these facts alone, and when viewed in the light most
favorable to the prosecution, any rational trier of fact could
reasonably have found the essential elements of at least one act of
arson[4] beyond a reasonable doubt prior to Kimbrel's death.     I
readily conclude this was not an objectively unreasonable
application of *Jackson*.

I reject petitioner's argument that the trial court
erroneously considered evidence of the 1991 fires to establish
petitioner's identity as the arsonist.  As noted above, the trial
court specifically noted that even without evidence of 1991 fires,
the record contains sufficient evidence that petitioner committed
the 1986 house fire, and I agree.   Tr. 1792-93.   Moreover, the
Oregon Court of Appeals determined that the evidence was relevant
and admissible under OEC 401.  Wieland, 131 Or.App. at 588-89.   I
must defer to the Oregon Court of Appeals' evidentiary ruling.

---

[4]I also conclude that there was ample evidence from which a
reasonable jury could conclude beyond a reasonable doubt that
petitioner was responsible for the 1986 attic fire.  Jackson, 443
U.S. at 319-20.  Because I have provided a detailed recitation of
those facts, and that the jury needed to find only one act of
arson to convict on the aggravated murder charge, I do not
provide further analysis.

Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Mendez v. Small, 298 F.3d 1154, 1158 (9th Cir. 2002); Peltier v. Wright, 15 F.3d 860, 862 (9th Cir. 1993).

### 2. Kimbrel suspected petitioner was responsible for the fires

Petitioner argues that the circumstantial evidence linking the 1986 fires to the murder is too speculative to support a conviction. I disagree.

"'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Ngo v. Giurbino, 651 F.3d 1112, 1114 (9th Cir. 2011)(quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). Although direct evidence is preferable, circumstantial evidence alone may be sufficient to establish guilt. Id. at 1114-15.

Here, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that Kimbrel suspected petitioner was the arsonist. As the prosecution convincingly argued against the motion for judgment of acquittal, there were numerous pieces of circumstantial evidence to support this element of aggravated murder. For example, numerous witnesses testified that Kimbrel's demeanor changed after the house fire; Kimbrel acted scared and asked others to pray for the safety of her family; Raney testified that Kimbrel thought someone was trying to kill Cindy and the children, and that "Cindy won't leave

[petitioner], and I won't leave Cindy"; and Farmer testified that Kimbrel did not believe Jody started the fires and "clammed up," giving him the impression that she knew who was responsible.

Additionally, Jeff Starr described tension between petitioner and Kimbrel after the fire, and saw what he believed were arguments between them. Mrs. Johnson noted that Kimbrel was panicked when she realized that Cindy and children were inside the burning house, and that Kimbrel witnessed petitioner's conversely unemotional response to the fire from which his family narrowly escaped. The prosecution also presented evidence that the house fire occurred on a Sunday morning after petitioner had been told of Kimbrel's plan to sleep on the sofa on Sunday night to catch the arsonist.

Based on this multitude of circumstantial evidence, I conclude that any rational jury could conclude that Kimbrel suspected petitioner was the arsonist. <u>Jackson</u>, 443 U.S. at 319-20. Even if I were inclined to draw a different inference from this evidence, I must resolve that conflict in favor of the prosecution. <u>Ngo</u>, 651 F.3d at 1115. Therefore, the state court's rejection of petitioner's claim was not an unreasonable application of the *Jackson* standard.

### 3.    Evidence that petitioner killed Kimbrel

Lastly, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that petitioner killed Kimbrel to conceal his identity as the arsonist.

Specifically, there was evidence that petitioner had the opportunity to kill Kimbrel. The evidence established the time of death between 9 a.m. and 12 p.m. At that time, Cindy was sleeping, Joshua was watching cartoons, and Jody was out of town. Relief milker, Tim Poublan was gone, and the milk was not scheduled for pick up that day. Conveniently, petitioner called Jeff Starr and told him not to come to work that day. Cindy testified that she recalled hearing her mother around 8 a.m. and next recalled petitioner coming into the house around 10:20 a.m. and leaving shortly thereafter. Thus, there was time between 9 and 10:20 a.m. during which any potential witnesses were absent and petitioner could have killed Kimbrel. The prosecution cogently argued that petitioner had the opportunity to kill Kimbrel sometime after breakfast and before he departed early for a meeting in an attempt to establish an alibi.

Additionally, a rational trier of fact could have concluded that the physical evidence discovered near the body was linked to petitioner. The cigarette butt was the same type smoked by petitioner, and the boot print matched petitioner's. Moreover, there was evidence of motive – petitioner recovered at least $150,000 worth of insurance proceeds from the fires by the time of Kimbrel's death. Furthermore, Kimbrel's distinctive kitchen knife, which was consistent with the wounds on the victim's body, was recovered in a hollow metal pipe in petitioner's barn.

37 - OPINION AND ORDER

Lastly, the defense's theory of the case is improbable. The defense's theory that someone else came onto the Monroe farm, lured or caught Kimbrel in the woods, stabbed her, and then left the farm between 10:30 and 11:30 a.m., is illogical. The evidence established that there were no tracks leading into or out of the woods. Under petitioner's theory, the stranger would necessarily have taken the path by the house to reach the woods, and would have needed to avoid detection by Cindy, who remained in bed after petitioner left around 10:30 a.m. until she rose at 11:30 a.m. Moreover, petitioner offered no explanation as to why Kimbrel's knife turned up in the metal pipe in his barn, stuffed with baling wire.

Again, even if it is possible to infer petitioner's theory of Kimbrel's death from the facts presented, I am required to resolve any conflicting inferences in favor of the prosecution. See Jackson, 443 U.S. at 326; Ngo, 651 F.3d at 115. When the evidence is considered in the light most favorable to the prosecution, I conclude that a rational trier of fact could have found that petitioner killed Kimbrel. And, under the required doubly-deferential standard of my review, petitioner has failed to demonstrate that the state court's denial of his motion for judgment of acquittal based on insufficient evidence was objectively unreasonable. Johnson, 132 S. Ct. at 2062; Boyer, 659 F.3d at 965.

In summary, after a careful review of the entire record of this case, there is evidence from which any rational jury could find sufficient evidence of guilt beyond a reasonable doubt on every element of aggravated murder. Moreover, the state court's rejection of petitioner's claim was not an objectively unreasonable application of the *Jackson* standard.

For all these reasons, petitioner has failed to demonstrate that the state court's rejection of his claim is either contrary to, or an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1). Accordingly, habeas relief is not warranted.

**CONCLUSION**

Based on the foregoing, petitioner's amended petition for writ of habeas corpus (#11) is denied. Because petitioner has made a substantial showing of the denial of a constitutional right, a certificate of appealability is GRANTED as to Ground 2 (sufficiency of the evidence).

IT IS SO ORDERED.

DATED this __/2__ day of FEBRUARY, 2013.

*Malcolm F Marsh*
Malcolm F. Marsh
United States District Judge

39 - OPINION AND ORDER